**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KAREN CAMESI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 09-85J |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| UNIVERSITY OF PITTSBURGH | ) | |
| MEDICAL CENTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Defendants' Motion (Doc. 451) to decertify this FLSA collective action will be granted, and Plaintiffs' Motion (Doc. 452) to finally certify the collective action will be denied. In addition:  Plaintiffs' Motion (Doc. 469) to strike Defendants' manager declarations will be denied; Plaintiffs' Motion (Doc. 472) to strike the opinions of expert Elaine Reardon will be granted; Plaintiffs' Motion (Doc. 475) to strike Defendants' statements of material fact will be denied; and Plaintiffs' Motion (Doc. 477) to strike the declaration of Charles Donina will be denied as moot.  Finally, a telephonic status conference will be scheduled to address how this case will proceed.

Plaintiffs have brought this collective action alleging, among other things, that Defendants (at times collectively, "UPMC") violated the FLSA.  *See generally* Compl. (Doc. 1).  The only other remaining claims are asserted under RICO.  *See* Am. Compl. (Doc. 266) at Count IV; Order dated Jan. 11, 2010 (Doc. 345) (dismissing all other claims).

This case involves UPMC's practice of automatically deducting thirty-minute meal breaks from the pay of non-exempt employees whose shifts lasted five or more hours. This was accomplished through UPMC's use of a computerized time tracking system, Kronos. UPMC's meal break deductions are actionable under the FLSA only to the extent that employees worked in excess of 40 hours in a given week, either before or after accounting for disputed meal breaks. *See* Pls.' Br. (Doc. 482) at 17 (agreeing that, "[i]f a specific employee did not work over 40 hours in any one week, . . . that employee does not have a bona fide claim in this lawsuit for that week"); Defs.' Br. (Doc. 456) at 15 (correctly observing that, assuming employee had five automatic meal break deductions during given week, he or she otherwise must have worked at least 37 ½ hours to be eligible for FLSA relief).

At the conditional certification stage, the Court found that UPMC's uniform, written policies regarding meal break deductions, coupled with the named Plaintiffs' and other affiants' sworn statements, were sufficient to meet the "fairly lenient" standards of similar situation at stage I. *See* Order dated May 14, 2009 (Doc. 104) at 4-9. The Court found that, although UPMC's policies directed employees to cancel the automatic deductions when they were required to work through meals, this approach "arguably shift[ed] the burden from Defendants to their employees to ensure that non-qualifying meal breaks [we]re not deducted from their pay." *Id.* at 6. In addition, the Court questioned whether UPMC's assessment of meal break deductions for employees receiving more than 20 minutes of uninterrupted time, but less than 30 minutes, was consistent with the FLSA. *See id.* at 4-6. The Court did not resolve these issues, however, but instead held that the determinations could not properly be made at the conditional certification stage. *Id.* at 6-7.

After notice to putative collective action members was issued, the parties embarked on a long and contentious course of discovery in support of certification/decertification.  The parties eventually submitted, and the Court adopted, a Consent Order and Stipulation staying any outstanding discovery pending the submission and adjudication of motions for certification/decertification.  *See* Consent Order (Doc. 442).  The Consent Order stated:

> Given the limited nature of discovery provided, it is possible that
> [the] Court may determine that additional discovery could assist a
> [final] certification determination, and, if so, such additional
> discovery will be permitted[,] to be followed by a second round of
> . . . certification motions.  Alternatively, the Court may determine
> that no amount of discovery would permit [final] certification,
> or that . . . certification is warranted based on the information
> discovered.

*Id.* at ¶ 4.

With respect to opt-in Plaintiffs ("opt-ins"), the parties agreed to conduct discovery regarding 75 former/current employees, with Defendants choosing the participants.  *See* Defs.' Statement of Facts (Doc. 455) at ¶ 13.[1]  Opt-in discovery consisted of 10 depositions and the completion of agreed-upon written questionnaires.

Of the first 75 opt-ins selected, 40 participated in discovery, and 35 elected to opt out rather than participate or were dismissed for refusal to participate.  *Id.* at ¶ 18.  An additional 35 opt-ins were selected, two of them participated, and 33 opted out or were dismissed for non-participation.  *Id.* at ¶ 19.  Thus, another 33 were selected.  *Id.* at ¶ 21.  In the end, only 52 opt-in

---

[1] For reasons explained below, the Court will deny Plaintiffs' Motion to strike Defendants' Statements of Fact.  To the extent that Plaintiffs dispute any of Defendants' Facts referenced in this Memorandum, the parties' disagreements are immaterial to the Court's ultimate conclusions. Finally, Defendants' Facts, to the extent they are relied on herein, are accompanied by appropriate record citation.

members completed questionnaires, and ten of those respondents, including the four named

Plaintiffs, were deposed.[2]

Although Plaintiffs' counsel likely would hasten to disagree, the facts revealed through

opt-in discovery, especially regarding the named Plaintiffs, are not supportive of a finding of

similar situation.

Lead Plaintiff Karen Camesi submitted an affidavit in support of conditional certification

stating, among other things:  that she "often" worked more than 40 hours a week; that her direct

supervisor observed her working through unpaid meal breaks; that UPMC "permit[ted]" and

"expect[ed]" her to work during meal breaks; and that UPMC's practice was "to not ensure that

employees who missed their meal break were paid."  *See* Camesi Aff. (Doc. 6-7) at ¶¶ 2, 18, 23,

39.  Discovery has revealed, however, that Ms. Camesi worked more than 37.5 hours per week in

only 24% of her workweeks.  *See* Defs.' Br. (Doc. 481) at 23 (citing record evidence).

Ms. Camesi received training regarding UPMC's meal break cancellation policies, and pursuant

to those policies, she was paid for working through meal breaks at least five times.  *See* Defs.'

Facts at ¶¶ 264, 276, 280; Defs.' Br. (Doc. 456) at 14 (Ms. Camesi would cancel deductions by

marking "no lunch" on weekly time sheets) (citing record evidence).  Her prior affidavit

notwithstanding, Ms. Camesi testified that her supervisor would not have been aware of whether

---

[2]  Plaintiffs object, based on relevancy, to Defendants' reliance on employment data from those
opt-ins who later opted out, who were dismissed for failure to participate in discovery or who
were eventually determined by Plaintiffs' counsel to be fully or partially ineligible for FLSA
relief.  *See* discussions *infra*; *compare also, e.g.*, Defs.' Facts at ¶ 22 (13 opt-ins in discovery
sample were employed pursuant to collective bargaining agreement, they were not subject to
automatic meal break deductions and therefore were ineligible for relief) *with* Pls.' Br.
(Doc. 453) at 2 n.1 (acknowledging that union members were not subject to automatic
deductions and cannot recover).  The Court disagrees that evidence regarding these current and
former opt-ins is irrelevant, and, for reasons intimated in a prior Order, the interests of fairness
dictate that Defendants be permitted to reference the evidence.  *See* Order dated May 24, 2010
(Doc. 382) at 22 (recognizing that high rate of opt-in attrition "undermin[ed] Defendants' ability
to . . . take meaningful discovery").

she had worked through unpaid meal breaks, and she never complained to any superior about working through meal breaks and not being paid.  Defs.' Facts at ¶¶ 278, 283.

The evidence regarding the other named Plaintiffs, whose materially similar affidavits were relied upon by the Court in granting conditional certification, likewise present an incongruous picture.  Named Plaintiff Dina Baker "rarely" missed a full meal break; she had seen UPMC's meal break policies in written form; she was never told by management not to cancel meal breaks; she was paid for working through a meal break at least once; and she admitted that her supervisors would have had no way of knowing whether she worked through an unpaid meal break.  *See* Defs.' Facts at ¶¶ 249, 253, 256, 257; Defs.' Br. (Doc. 456) at 34 (citing record evidence).  Named Plaintiff Erin O'Connell worked over 37 ½ hours per week only 50 percent of the time, and she cancelled her meal break deductions on 174 occasions. *See* Defs.' Facts at ¶¶ 228; Defs.' Br. (Doc. 481) at 23.  Named Plaintiff Lori Shaffer worked over 37 ½ hours per week only 40 percent of the time, and her meal break deduction was automatically overridden by a "work rule" in Kronos on 43 of her total 84 shifts at UPMC, or 51.2 percent of the time.  *See* Defs.' Facts at ¶¶ 238-39; Defs.' Br. (Doc. 481) at 23.[3]

In sum, the evidence regarding the named Plaintiffs is far less satisfying than their allegations in support of conditional certification.  The other affiants on which the Court relied do not appear to have fared much better.  *See* Defs.' Br. (Doc. 456) at 9 n.6 (affiant Lea Ferguson cancelled her meal break deduction for vast majority of her shifts, or 180 times in 1 & ½ years);

---

[3]  In seeking to exclude the sworn statements of opt-ins' supervisors, Plaintiffs' counsel have argued, somewhat audaciously, that the sworn statements of <u>Ms. Shaffer's</u> supervisor should be stricken.  *See* Pls.' Mot. (Doc. 469) at 7-9 (seeking exclusion of supervisor's statements because Ms. Shaffer "[was] not subject to . . . [m]eal [b]reak [d]eduction[s] for the period[] discussed in the [supervisor's] declaration[]").  Counsel's request to strike evidence regarding a named Plaintiff's employment settings provides an extreme, if not absurd, example of the infirmities with their approach.

5

Order dated Oct. 15, 2010 (Doc. 421) (granting summary judgment against affiant Patricia

Gratton because she failed to rebut Defendants' evidence that she was FLSA-exempt); Order

dated May 24, 2010 (Doc. 382) at 20 n.9 (dismissing affiant Maria Mazzarini based on her desire

to opt out of collective action); Doc. 459-2 at pg. 3 of 4 (indicating that affiant Christina

Updegraff's meal break deductions were automatically overridden by "work rules" on four

occasions, and cancelled on six).

     Even had Plaintiffs fared better, their burden is significantly higher at stage II.

Prise v. Alderwoods Group, Inc., -- F. Supp.2d --, 2011 WL 4101145, *17 (W.D. Pa. Sept. 9,

2011) (Conti, J.) (citations omitted).  Although putative collective action members need not be

"identically" situated, the requirements of similar situation are more rigorous given the parties'

opportunity to take discovery.  Andrako v. U.S. Steel Corp., 788 F. Supp.2d 372, 378 (W.D. Pa.

Mar. 9, 2011) (citations omitted).  In evaluating similar situation at stage II, the Court considers:

(1) disparate factual and employment settings of the individual plaintiffs; (2) the various

defenses available to defendant that appear to be individual to each plaintiff; and (3) fairness and

procedural considerations.  Prise at *17 (citations omitted).

     Plaintiffs' legal positions have advanced little since the time of conditional certification.

See generally Pls.' Br. (Doc. 453).  Essentially, Plaintiffs ask the Court to focus narrowly on

UPMC's "common polic[ies]" of making automatic deductions where employees received more

than twenty minutes of uninterrupted meal breaks.  In Plaintiffs' view, UPMC's common

policies override all of the various dissimilarities between collective action members identified

by Defendants.  To the extent that disparate circumstances have proven opt-ins ineligible for

FLSA recovery, Plaintiffs disregard them as falling outside the collective action.  See, e.g.,

id. at 2 n.1 (releasing claims of opt-ins for union members who were not subject to deduction,

opt-ins who did not work at UPMC and for opt-ins whose deductions were automatically cancelled every shift).  When opt-ins have proven ineligible for recovery for certain shifts/workweeks, Plaintiffs assure that these issues can be sorted out after a grant final certification.  *See, e.g.*, Pls.' Br. (Doc. 482) at 17 (arguing that opt-ins who worked less than 40 hours per week can be addressed on summary judgment)[4]; *compare also* Defs.' Br. (Doc. 456) at 7-8 (highlighting opt-ins whose deductions were automatically cancelled by Kronos "work rule[s]") *with, e.g.*, Pls.' Br. (Doc. 482) at 21-22 (arguing that questions of whether opt-ins were, in fact, paid for meal breaks is matter of damages that can resolved through representative testimony).

In sum, Plaintiffs take the position that final certification is warranted based on a small number of legal questions that, in essence, have not changed since the filing of the Complaint. Although Plaintiffs have used discovery to shore up largely undisputed aspects of Defendants' meal break policies, their arguments for final certification, if accepted, would beg the question, why should the Court not have finally certified a collective action at the conditional certification stage?

To be fair, the Court's Order of conditional certification did find Plaintiffs' theories of common policy sufficient under the relatively lenient standards then applicable.  At that point, however, the Court took the Plaintiff-affiants' statements at face value, and fewer of the significant factual dissimilarities between opt-ins were apparent.  The decision also was made

---

[4] In arguing that 40-hour workweek issues can be resolved through summary judgment, Plaintiffs cite District Judge Donetta Ambrose's decision in Kuznyetsov v. West Penn Allegheny Health Sys., Inc., 2011 WL 465760, *2 (W.D. Pa. Feb. 4, 2011).  *See* Pls.' Br. (Doc. 482) at 17-18.  In Kuznyetsov, summary judgment was utilized to address opt-ins who never worked more than 40 hours per week, not employees like the named Plaintiffs here, who worked less than 40 hours some weeks and more than 40 hours in others.

without the benefit of the recent jurisprudential developments in the realm of FLSA meal-break

litigation.

Since the undersigned's grant of conditional certification, a growing consensus of federal

courts has rejected the notion that collective action treatment of automatic deductions is

warranted under an FLSA "burden-shifting" theory.  As the court in <u>White</u> observed:

> [T]wo courts [in the Western District of Pennsylvania] have
> conditionally certified collective actions based on 'shifting the
> burden' theories . . . .  In both cases, however, the courts spoke
> at the lenient first stage of the similarly situated analysis,
> which they recognized in granting conditional certification. . . .
> [When an] action is at the second stage, the burden is higher.

<u>White v. Baptist Mem. Health Care Corp.</u>, 2011 WL 1883959, *10 (W.D. Tenn. May 17, 2011)

(citations and some internal quotations omitted).  The <u>White</u> Court then held:

> To bind together otherwise differently situated employees,
> an alleged common policy must potentially violate the FLSA. . . .
> Standing alone, an employer policy providing automatic
> deductions for meal breaks does not violate the FLSA. . . .
> Therefore, [an employer's] mere adoption of a system that,
> by default, deducts meal breaks from its employees' compensation
> does not constitute a unified policy of FLSA violations capable of
> binding together [a collective action].

*Id.* at *8-9 (citations omitted).  Since the instant action was conditionally certified,

the conclusions in <u>White</u> have become the prevailing view.  *See, e.g.*, <u>Blaney v. Charlotte-</u>

<u>Mecklenburg Hosp. Auth.</u>, 2011 WL 4351631, *6 (W.D.N.C. Sept. 16, 2011); <u>Zivali v. AT & T</u>

<u>Mobility, LLC</u>, 784 F. Supp.2d 456, 462-63 (S.D.N.Y. May 12, 2011); <u>Cason v. Vibra</u>

<u>Healthcare</u>, 2011 WL 1659381, *3 (E.D. Mich. May 3, 2011); <u>Frye v. Baptist Mem. Hosp.</u>,

2010 WL 3862591, *5 (W.D. Tenn. Sept. 27, 2010).

In recognizing that an employer's use of automatic meal break deductions is not *per se* violative of the FLSA, courts have required collective action plaintiffs to show more:

> Where an employer's formal policy is to compensate employees for all time worked, courts have generally required a showing that the employer's common or uniform practice was to not follow its formal, written policy. . . .  There must be a showing that enforcement of the automatic deduction policy created a policy-to-violate-the-policy. . . .  At [stage II], to support a 'shifting the burden' theory capable of binding the [opt-ins] together, there must be substantial evidence that [the employer], in fact, shirked its FLSA responsibilities.

White, 20111WL 1883959 at *9-10 (citations and internal quotations omitted); *accord* Frye, 2010 WL 3862591, *5; Saleen v. Waste Mgmt., Inc., 2009 WL 1664451, *5 (D. Minn. Jun. 15, 2009).

While the Court stands by its decision to conditionally certify this collective action based on the allegations and arguments previously before it, the undersigned agrees with the above-referenced decisions that UPMC's implementation of an automatic deduction policy does not, in and of itself, warrant final certification.  The Court also rejects Plaintiffs' suggestion that Defendants' "policy to violate a policy" arguments improperly delve into the merits of Plaintiffs' FLSA claims.  *See* Pls.' Br. (Doc. 482) at 4-6.  Defendants' arguments are made in response to Plaintiffs' assertion that UPMC's meal break policies improperly shifted its FLSA burdens to employees.  Indeed, Plaintiffs' burden-shifting theory is integral to their attempts to overcome the obvious differences in employment settings under factor (1) of the decertification analysis. *See* Pls.' Br. (Doc. 453) at 14 ("the first prong of the Stage II certification test is met if the opt-in plaintiffs are challenging a common policy by the defendants, even if the employees subject to that policy had other differences in their employment settings") (citing Andrako) (emphasis added).  The decisions referenced above have rejected the proposition that allegations of "*per se*"

FLSA violation are enough, and the "policy to violate a policy" standard establishes the quality of evidence required at stage II of the certification analysis.

Turning to the facts in this case, Defendants' evidence casts doubt on Plaintiffs' suggestion that UPMC utilized its meal break policies to "shirk" its FLSA obligations. As indicated above, the named Plaintiffs themselves admit to having been trained on and/or were aware of how to cancel meal break deductions, and they did so on many occasions. *See* Defs.' Facts at ¶¶ 224-28, 249, 255-57, 264, 276, 280.  To the undersigned's knowledge, Plaintiffs' counsel has failed to identify opt-in member(s) who were dissuaded from cancelling, or instructed not to cancel, deductions for meal breaks.  Nor are there any allegations that employees who cancelled meal breaks suffered retaliation.

Defendants, moreover, have introduced evidence regarding their significant efforts to advise employees and managers regarding the substance of the meal break policies and Defendants' efforts to monitor and ensure compliance.  *See* Defs.' Br. (Doc. 456) at 5-6, 18-19 (citing record evidence).  Although Plaintiffs quibble with such evidence, the Court finds that the record on the whole does not support the allegations of evasiveness intimated in the Complaint. *Cf.* Compl. at ¶¶ 91-92 (alleging that UPMC's management "affirmatively stated" to Plaintiffs that they "could not be paid" for time worked over meal breaks).  Under the circumstances, Plaintiffs have not carried their burden at stage II.  *See* White, 2011 WL 1883959 at *9, 11 (holding same under materially analogous facts); Frye, 2010 WL 3862591 at *5-8 (noting that many opt-ins utilized cancellation procedures, and finding that, if employer's education and training procedures were inadequate, "there would be substantial evidence that the [p]laintiffs were unaware of [the defendant's] policies").

The Court also is unmoved by Plaintiffs' contention that they are entitled to take additional discovery to demonstrate that UPMC had a policy to violate a policy. *Cf.* Pls.' Br. (Doc. 482) at 6, 10. Through the course of the instant Motions, Plaintiffs' explanations for agreeing to stay discovery have shifted. *Compare* Pls.' Br. (Doc. 453) at 3 (Plaintiffs' counsel "was hesitant to agree to [the stay]") *with* Pls.' Br. (Doc. 482) at 10 ("Plaintiffs <u>advocated</u> [the stay] in an attempt to conserve resources by focusing . . . on non-discovery intensive theories of liability") (emphasis added). Moreover, Plaintiffs' interpretation of the stay Order, if adopted, would result in Defendants and the Court having agreed to the legal equivalent of, "heads Plaintiffs win, tails Defendants lose" (*i.e.*, if the Court agrees with Plaintiffs' obvious arguments for certification, their Motion will be granted, but if the Court agrees with Defendants' obvious arguments for decertification, Plaintiffs get more discovery). Plaintiffs' position smacks of sandbagging, and the Court's adoption of the Consent Order neither intended to nor did sanction such an approach.

In any event, Plaintiffs were, or should have been, well aware of the case law concluding that evidence of an employer's use of automatic deductions, alone, is insufficient to survive stage II. *Compare* Joint Motion for Consent Order (Doc. 44) (filed <u>December 28, 2010</u>) *with, e.g.*, <u>Frye</u> (decided <u>Sept. 27, 2010</u>); *cf. also* Pls.' Mot. for Consideration of Add'l Authority (Doc. 498) (notifying Court of meal break decision less than one month after decision was issued). Had Plaintiffs any doubts regarding their ability to rebut Defendants' likely and obvious arguments for decertification, it was incumbent upon them to satisfy those doubts before submitting to the Court's adjudication.

Furthermore, if any evidence of Plaintiffs' potential "policy to violate a policy" theory exists, at least some of that evidence reasonably would be expected to appear within the

knowledge and possession of Plaintiffs themselves. *See* White at *7 and Frye at *11 (finding

that opt-ins' admitted awareness and use of deduction cancellation procedures significantly

undermined plaintiffs' policy-to-violate-policy allegations).  Given various opt-ins' widespread

use of the cancellation procedures, and the dearth of evidence showing employer dissuasion or

retaliation, the Court has no reason "to believe [that] additional discovery could assist a [final]

certification determination." *See* Consent Order at ¶ 4.

For all of the reasons stated above, Plaintiffs' reliance on UPMC's automatic deduction

policy to avoid "disparate factual and employment settings" under factor (1) is unavailing.

Otherwise, Defendants have demonstrated a plethora of differences between the putative

Plaintiffs that would make utilization of the collective action vehicle unmanageable.

At the heart of many of these distinctions was the decentralized nature of UPMC's

implementation and enforcement of the meal break policies.  UMPC's written Compensation

Manual specifically stated:  "It is the responsibility of each employee to accurately record time

on a daily basis via the manner designated by [his or her] department, including overriding

automatic lunch deductions (if working through lunch or interrupted during lunch)."

Doc. 460-10 at pg. 10 of 50 (emphasis added); *see also* Doc. 460-10 at pg. 19 of 50.

Defendants have demonstrated numerous distinctions in this regard:

- The opt-ins fell within over 500 different job titles, working in
  over 1000 departments, Defs.' Br. (Doc. 456) at 17-18 (citing
  record evidence); [5]

---

[5] The opt-ins' job titles ranged from staff nurses, respiratory therapists and patient care
technicians to administrative assistants, data entry clerks, dishwashers, snack bar aides, cooks,
PC consultants, phlebotomists, security officers, research associates, billing specialists,
pharmacy technicians, parking attendants, drivers and groundskeepers. *Id.* at 17-18.  Obviously,
a number of the opt-ins' responsibilities had little connection with exigent patient care.

- The 143 opt-ins within the potential discovery pool worked for 250 different supervisors, in a total of 107 job titles and 126 departments, *id.* at 18;[6]

- UPMC's various departments would record employees' work time in different ways:  by having employees "swip[e] in/out" at a Kronos station at the beginning and end of each shift; by using a computer program ("Timestamp") to record beginning and ending times; by using a telephone system called "Teletime"; or by recording work time by hand on paper, *id.* at 6-7;

- The method for cancelling automatic deductions differed based on the varying methods of time recordation just referenced, as well as individualized rules of the business units, *id.* at 8-10;

- Certain departments used Kronos "work rules" that automatically overrode deductions for employees on some or all shifts, *id.* at 7 (citing record evidence);

- A number of UPMC's departments/business units paid for an employee's meal break if it was interrupted at all, regardless of how many uninterrupted minutes the employee enjoyed, *id.* at 4;

- Some units' policy was to pay for meal breaks unless the employee received 30 uninterrupted minutes, *id.* at 5;

Other differences between employees and/or their departments were as follows:

- Some employees would not have a scheduled time for meal breaks and would take them when they could, other employees had regularly scheduled 30-minute breaks, and others had scheduled breaks that could not always be followed, *id.* at 10-11;

---

[6] 143 is the number of opt-ins who were asked to participate in discovery, and it reflects the significant opt-in attrition referenced above.  *See* discussion *supra* (noting selection of 75 opt-ins in first round, 35 in second round, and 33 in third round).  To the extent that Plaintiffs complain regarding Defendants' inclusion in the discovery pool of opt-ins who no longer are participating, that objection is overruled for reasons stated above.  Although Plaintiffs also have objected to evidence regarding how Defendants selected opt-ins for discovery, this issue is moot because the Court has not relied on such evidence in granting decertification.  *Cf.* discussion *infra* (rejecting testimony of Defendants' expert statistician because Defendants' selection of opt-ins was not random).  Otherwise, Plaintiffs have failed to show that Defendants' selection of opt-ins was biased or objectionable in any meaningful way.

- Opt-ins' experiences regarding the number of meal breaks missed or interrupted varied, as did the number of times they reported and/or were paid for such breaks, *id.* at 13-14;

- The number of opt-ins who worked more than 40 hours per week, even counting meal breaks as time worked, varied between employees and among single employees themselves, *see id.* at 14 *and* discussion *supra* regarding named Plaintiffs;

- 98 of the opt-ins have asserted equitable estoppel based on allegedly being misled by the absence of FLSA posters, Defs.' Br. (Doc. 456) at 18;

- Of the 143 opt-ins in the discovery pool, 13 of them were union members, *id.* at 18; and

- 16 of the opt-ins were FLSA-exempt for the entirety of their employment, and 3 of the 143 discovery opt-ins were exempt for at least a part of their employment, *id.* at 18.

The breadth of these disparate factual and employment settings seems self-apparent, and this Court joins the others before it in finding that factor (1) strongly favors decertification. Particularly, the Court relies on the persuasive authority in <u>White</u>, <u>Frye</u>, <u>Blaney</u> and <u>Reed</u>.

In <u>White</u>, the court found that decertification was appropriate under factor (1) based on materially similar facts. Among other things, the court found relevant that: each of the defendants' departments were "free to formulate . . . procedure[s] that work[ed] best for its employees" in implementing the automatic meal deduction plan, *id.*, 2011 WL 1883959 at *1; differences in the opt-ins' job duties "[we]re highly relevant to their claims that they worked during meal breaks without compensation because their job duties dictated whether and why they experienced missed or interrupted meal breaks," *id.* at *7; and that the existence of a relatively small number of opt-ins who were "unaware of the meal break policy and exception log procedures d[id] not constitute substantial evidence that [the defendant] shirked its FLSA duties and that the otherwise disparately situated [opt-ins were], in fact, similarly situated." *Id.* at *11;

*accord* Frye (reaching same conclusions).  Blaney and Reed likewise are analogous.

Blaney, 2011 WL 4351631 at *7-8 (decertifying collective actions because, among other things:

defendant established that many alleged common policies were "actually left to the decentralized

discretion of the individual units and . . . management staff"; "the policies regarding the

scheduling of meal breaks and the manner in which meal breaks [were] taken var[ied] between

units"; "each unit also implemented different methods for entering corrections into [employees']

time-sheets in order to account for missed or interrupted meal breaks"; and, "[w]hen alleged

FLSA violations stem from the enforcement decisions of individual supervisors, without a

company-wide policy or plan directing those enforcement decisions, collective treatment is not

appropriate") (emphasis added); Reed v. County of Orange, 266 F.R.D. 446, 450 (C.D. Cal.

Jan. 8, 2010) ("[d]ecertification is appropriate where plaintiffs are subject to varying work

conditions in different work locations or under different supervisors," and "the disparity between

[p]laintiffs' factual and employment settings as to . . . their meal breaks result[ed] in highly

individualized questions of fact that ma[de] proceeding as a collective action impractical and

prejudicial to the parties") ; *compare also* Prise, 2011 WL 4101145 at *27 (decertifying meal

break claims because, as here, "[a] common thread running through plaintiffs' testimony

concerning the meal break policy was that compensation practices varied not only among

plaintiffs, but for each sample plaintiff viewed in isolation") (emphasis added) *with* Defs.' Facts

(revealing inconsistencies between single employees themselves regarding applicable meal break

procedures and utilization of cancellation mechanisms).

Turning to factor (2), the individuality of defenses, the Court concludes that this

consideration also favors decertification.  Among other things, individualized defenses include

whether UPMC's management had actual or constructive knowledge of any off-duty work

performed, <u>Zivali</u>, 784 F. Supp.2d at , 467-68,[7] whether individual opt-ins were exempt from the

FLSA for any relevant period of time, and whether individual plaintiffs actually worked overtime

without compensation.  <u>Wright v. Pulaski County</u>, 2010 WL 3328015, *10 (E.D. Ark. Aug. 24,

2010); *accord* <u>Prise</u>, 2011 WL 4101145 at *27 (finding that individualized defenses favored

decertification, including those regarding "bona fide meal break[s]," discussed in more detail,

*infra*).

Finally, factor (3), regarding fairness and procedural considerations, favors

decertification.  Although the Court is not entirely unsympathetic to Plaintiffs' arguments

regarding the desirability of pooling resources to seek vindication of otherwise potentially

impracticable claims, this cannot be viewed as the only consideration.  Instead, the Court must

balance the reduced litigation costs to individual Plaintiffs with the potential effects that final

certification may have on the fairness of the adjudication and the interests of manageability and

judicial efficiency.  *See* <u>White</u> at *13.

Although Plaintiffs' counsel generally suggest that the various individualized inquiries

could be handled through representative testimony, bifurcation or subclassification, they offer no

meaningful explanations of how this could be accomplished.  *See* <u>White</u> at *14

("[i]f representative testimony that would resolve the fairness and manageability issues in this

litigation were readily available, the Court would expect [the plaintiff] to rely on that testimony

to support her argument[s]").  At the very least, it seems apparent that the named Plaintiffs would

not be good candidates.  *See* discussions *supra*.  There are far too many individualized inquiries

to be addressed through representative testimony, bifurcation and sub-classifications,

and factor (3) favors decertification.

---

[7] *Cf.* Defs.' Facts at ¶¶ 241, 253, 278 (citing named Plaintiffs' admissions that their supervisors would not have known whether Plaintiffs had worked through meal breaks).

The only matter warranting further discussion is a wrinkle in this case not directly addressed in many of the decision referenced above.  The issue is UPMC's "20-minute" policy.

UPMC's written compensation manual, in relevant part, provided:

UPMC attempts to grant a 30-minute meal period for all employees even though meal periods are not required under the FLSA.  Typically, this meal period is unpaid.  However, meal periods must be counted as hours worked unless all three of the following conditions are met:

- The meal period must be scheduled for 30 minutes;

- The employee is completely relieved of all duties during the meal period; and

- The employee is free to leave the workstation or area.

<u>If a non-exempt employee does not receive 20 consecutive minutes of uninterrupted time[,] it will be considered work time and will be paid</u>.  Answering a page or beeper is considered to be an interruption.

***Example***

An hourly paid registered nurse begins a work shift at 8:00 a.m. and at 1:00 p.m. goes to the lunch room for a scheduled lunch break.  The employee is interrupted by a page at 1:15 p.m. and responds by leaving the lunch room and returning to work.  In this instance, the employee did not receive 20 consecutive minutes of uninterrupted time and the meal period is counted as hours worked.

*See* Order dated May 14, 2009 (Doc. 104).  Based on the arguments then before the Court, and for the purposes of conditional certification, the undersigned found that Plaintiffs' allegations regarding the 20-minute rule supported a grant of conditional certification. *See id.* at 4-6.

Plaintiffs have advanced two theories of FLSA recovery regarding the 20-minute rule. Under the first theory (previously referred to as the "meal break differential" theory), if an employee is interrupted after minute 20 of her 30-minute meal break, and presumably is unable to return immediately to her break, UPMC's policy may result in her not being paid for

anywhere between 1 to 9 minutes of work time.  *See* Pls.' Br. (Doc. 453) at 11.  Thus, assuming

the employee worked more than forty hours in a given week, not counting time legitimately

deducted for meal breaks, she may be entitled to minutes per week of FLSA-covered pay.

Under Plaintiffs' second theory, UPMC's 20-minute rule violates FLSA regulations

regarding the permissible non-payment of "<u>bona fide</u> meal periods."  *See* Order dated May 14,

2009 (Doc. 104) at 4-5 (emphasis added).[8]

The Court notes that, as a practical matter, Plaintiffs' meal-break differential theory,

standing alone, would essentially reduce Plaintiffs and their counsel to seeking "slivers of slices"

of FLSA recovery.  Given the needles that would need to be thread, and the limited nature of

recovery, it would seem that retaining class treatment for these claims would be an end for the

sake of itself.

This observation aside, the individualized nature of Plaintiffs' claims, and the attendant

problems with manageability, would increase exponentially under this theory.  For all of the

reasons iterated above, the meal-break differential theory is ill-suited for collective action

treatment.

---

[8] According to the Department of Labor:

> Bona fide meal periods are not worktime.  Bona fide meal periods do not include
> coffee breaks or time for snacks.  [Those] are rest periods.  The employee must be
> completely relieved from duty for the purposes of eating regular meals.
> Ordinarily 30 minutes or more is long enough for a bona fide meal period.
> A shorter period may be long enough under special conditions.  The employee is
> not relieved if he is required to perform any duties, whether active or inactive,
> while eating.

29 C.F.R. § 785.19(a).

As for Plaintiffs' "bona fide" meal break theory, District Judge Joy Flowers Conti specifically held in Prise that the defenses available to this type of claim are too individualized for collective action treatment.  See id., 2011 WL 4101145 (individualized defenses include "whether the employee was required to perform work for [her employer] during a meal break, [and] whether the particular meal break was a bona fide meal break, including the time, frequency and duration of the interruptions").

Furthermore, the Court simply cannot conclude that the legal issue of whether UPMC's 20-minute policy was FLSA-compliant outweighs the myriad of individualized inquiries required for collective action recovery.  The entire purpose of the similar situation analysis is to determine whether the benefits of resolving common questions outweigh the difficulties presented by individualized inquiries.  See White, 2011 WL 1883959 at *4, 14.  In this case they do not, and decertification is warranted.[9]

None of Plaintiffs' arguments persuade the Court otherwise.  Given counsels' awareness of, and familiarity with, the relevant meal break precedent, the Court sees little benefit in explaining why it finds Plaintiffs' cited decisions either distinguishable or unpersuasive.

The undersigned also finds Judge Ambrose's decision in Andrako distinguishable. Andrako addressed FLSA claims for pre and post-shift walking and the donning and doffing of work gear.  See id., 788 F. Supp.2d at 377.  Unlike meal break cases, courts have proven more amenable to granting stage II certification in those types of cases.  See In re Tyson Foods, Inc., 694 F. Supp.2d 1372, 1380 (M.D. Ga. Mar. 16, 2010) (collecting cases holding same).

---

[9]  Assuming that numerous individual actions will be filed on behalf of the dismissed opt-ins, as Plaintiffs' counsel suggest, it would seem entirely reasonable to believe that principles of stare decisis would prevent the legal sufficiency of Defendants' 20-minute rule from being litigated over and over.  Thus, the benefit of resolving the issue on a collective basis would appear dwarfed by the difficulties created by maintaining an otherwise unmanageable collective action.

The collective action pool was far smaller in <u>Andrako</u>, moreover, and the policy in question applied to workers in a single manufacturing plant.  *See* <u>Andrako</u> at 375-76. In addition, there was no evidence of decentralized enforcement mechanisms that differed from department to department and/or manager to manager.

Finally, Judge Ambrose's decision in <u>Andrako</u> was not made within the context of automatic meal break deductions, where a majority of persuasive decisions have held that the central practice is not a *per se* FLSA violation, and where courts have found, on materially similar facts, that the difficulties presented by individualized inquiries outweigh the benefits of a collective resolution.

For all of the reasons stated above, Plaintiffs' Motion for final certification will be denied, and Defendants' Motion for decertification granted.  For the purposes of the record, Plaintiffs' evidentiary Motions regarding certification/decertification are resolved as follows.

Plaintiffs' Motion (Doc. 469) to strike UPMC's manager declarations is denied. Plaintiffs' relevancy objections are overruled, and fairness dictates that Defendants be permitted to cite evidence regarding managers who supervised opt-ins whose FLSA claims have been voluntarily or involuntarily abandoned in full or in part.

 Plaintiffs' Motion (Doc. 472) to strike the opinions of Defendants' expert statistician, Elaine Reardon, will be granted.  Defendants concede that the opt-in sample was not randomly selected, but, rather, was chosen by UPMC's senior director of human resources, Charles Donina.  *See* Defs.' Br. (Doc. 489) at 16-17.  Notwithstanding Mr. Donina's assurances that meal break data were not considered, the absence of random sampling renders Ms. Reardon's opinions unreliable.  *See generally* R. Paetzold and S. Willborn, *The Statistics of Discrimination* § 2:6 (2011) ("statistical inference is used . . . to generalize from a sample to a

population," and "[i]nferential statistical procedures [require] that the sample" be "randomly drawn from . . . the larger population"); In re Chevron U.S.A., Inc., 109 F.3d 1016, 1019 (5th Cir. 1997) (recognizing same).[10]

Plaintiffs' Motion (Doc. 475) to strike Defendants' statements of fact will be denied. Regardless of whether Defendants' submission was contemplated by the Court or parties, Plaintiffs have suffered no undue prejudice. Plaintiffs were not ordered to file responses to Defendants' Facts, they have enjoyed ample opportunity to submit their own supportive materials and they have done so through the filing of lengthy affidavits.

Finally, Plaintiffs' Motion (Doc. 477) to strike Mr. Donina's declaration will be denied as moot. Plaintiffs' Motion relates to Mr. Donina's statements regarding the process through which Defendants selected opt-ins for discovery. *See* Pls.' Br. (Doc. 483). For the reasons previously stated, the selection process is immaterial to the Court's decision to grant decertification.

Consistent with the above Memorandum, the Court hereby enters the following:

## II. <u>ORDER</u>

Defendants' Motion (**Doc. 451**) for decertification is **GRANTED**; Plaintiffs' Motion (**Doc. 452**) for final certification is **DENIED**; Plaintiffs' Motion (**Doc. 469**) to strike UPMC's manager declarations is **DENIED**; Plaintiffs' Motion (**Doc. 472**) to strike the opinions of Elaine Reardon is **GRANTED**; Plaintiffs' Motion (**Doc. 475**) to strike Defendants' statements of fact is **DENIED**; and Plaintiffs' Motion (**Doc. 477**) to strike the declaration of Charles Donina is

---

[10] Equally, if not more, unreliable is Plaintiffs' citation to the NDNQI Survey. As Defendants point out, this survey reflects the responses of nurses in 696 different hospitals, and Plaintiffs have failed to establish whether any UPMC facilities were included. *See* Defs.' Br. (Doc. 481) at 8-9. In any event, the NDNQI Survey does not sway the Court's ruling on decertification. *See* discussions *supra*; *see also* <u>Kuznyetsov</u>, 2011 WL 465760 at *2 (imputing NDNQI Survey results to individual plaintiffs would require "pure speculation").

**DENIED AS MOOT**.  IT IS FURTHER ORDERED that the FLSA claims of all opt-ins,

other than the named Plaintiffs, are DISMISSED WITHOUT PREJUDICE.  Finally,

a Telephonic Status Conference will be held on **January 11, 2012 at 2:15 p.m.** to discuss how

this case will proceed.[11]  All participants shall contact the undersigned's Chambers on a single

telephone line, and Plaintiffs' counsel shall coordinate the call.

       IT IS SO ORDERED.


December 20, 2011                                        s\Cathy Bissoon
                                                      Cathy Bissoon
                                                      United States District Judge

cc (via ECF email notification):

All Counsel of Record

---

[11]  In advance of the Conference, opposing counsel should confer to discuss whether settlement may be reached regarding the named Plaintiffs and/or some or all of the dismissed opt-ins. If and as appropriate, the Court is willing to facilitate settlement negotiations.